Raymond D. McElfish, Esq. (SBN 224390)
Email: rmcelfish@mcelfishlaw.com
**MCELFISH LAW FIRM**
1112 N. Sherbourne Drive
West Hollywood, CA  90069
Telephone: (310) 659-4900
Facsimile: (310) 659-4926

*Attorney for Plaintiff, Charlotte Flaherty*

## UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLOTTE FLAHERTY, | Case No.: 2: 20 CV-03897-FLA-GJS |
| Plaintiff, | **PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10** |
| vs. | |
| UNITED STATES OF AMERICA, a government entity; UNITED STATES POSTAL SERVICE, a government entity; DANIEL JOSEPH DANKELS, an individual and DOES 1 through 10 | |
| Defendants. | |

TO DEFENDANTS AND THEIR ATTORNEY(S) OF RECORD:

Plaintiff Charlotte Flaherty hereby files and serves here Trial Brief under Local Rule 16-10 as follows:

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................3

II.   DEFENDANT'S REFERENCES TO THE CA DMC HAND BOOK SECTIONS WILL BE OBJECTED TO AT TRIAL ............................................................................3

III.  PLAINTIFF DID NOT MISCHARACTERIZE THE TESTIMONY OF MR. MOLNAR ON THE PEAK ACCELERATION IN THE ACCIDENT ................................5

IV.   PLAINTIFF IS NOT LIMITED BY THE ADMINISTRATIVE CLAIM............................8

V.    PLAINTIFF IS NOT BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION… ....................................................................................12

VI.   CONCLUSION ...................................................................................15

## TABLE OF AUTHORITIES

**Cases**

*Chadd v. United States,* 794 F.3d 1104 (9th Cir. 2015) ...................................13

*McDonald v. United States,* 555 F. Supp. 935, 957-61 (M.D.Pa. 1983) ......................11

*Nurse v. United States,* 226 F.3d 996, 1001 (9th Cir. 2000) ...............................15

*O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002)............................14

*Powers v. United States,* 589 F. Supp. 1084-1109-10 (D. Conn. 1984)........................11

*Richardson v. United States,* 841F.2d 993, 999 (9th Cir. 1988) ...........................11

*United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)................................................................................14

*Wilcox v. US. Postal Service,* 2019 WL 4138007 (may 3, 2019)..............................10

**Statutes**

28 U.S.C. § 2675(b)................................................................................9

28 U.S.C. § 2680(a)...............................................................................13

**Rules**

California Vehicle Code section 21750(a) ......................................................4

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# I.   <u>INTRODUCTION</u>

The issues raised by Defendant in their trial brief are specious and baseless. The California DMV Driver's Handbook should not be admitted because it was never disclosed in fact or expert discovery and plaintiff will object on that basis at trial. The testimony of Defendant's accident reconstruction expert was not mischaracterized, it is just not at all favorable to the Defendant on key issues relating to peak acceleration.  The administrative claim should not limit Plaintiff's claims based on the evidence that will be adduced at trial for the reasons set forth below and the negligent entrustment cluster of claims is not barred by the discretionary function as set forth below.

# II.   **DEFENDANT'S REFERENCES TO THE CA DMC HAND BOOK <u>SECTIONS WILL BE OBJECTED TO AT TRIAL</u>**

Defendant bases its claims in its trial brief that Plaintiff violated the California Vehicle Code section 21750(a), which requires that vehicles overtaking other vehicles moving in the same direction pass "to the left at a safe distance without interfering with the safe operation of the overtaken vehicle."  However, the evidence on this point will be disputed at trial. Defendant's version of the accident is that Plaintiff cut him off from the left most through lane on North Sepulveda Boulevard at the controlled traffic intersection with Victory Boulevard in Van Nuys on the date of the accident. However, Plaintiff will show at trial that based on the evidence this version of the accident offered by the United States is not even possible given the deposition testimony of the parties and is at best inconsistent with the testimony of their own accident reconstruction expert. Plaintiff maintains, and the testimonial and physical evidence will support her claims, that she was in the right most turn lane stopped when she was rear-ended on the left side of the rear of her vehicle by the Defendant's employee. The Plaintiff will show that Defendant is 100% responsible

for this accident and the severe injuries that it caused. The Court can consider following any California Vehicle Code it chooses depending upon the evidence received. Plaintiff will ask the Court to consider the CVC Section 22350 for Defendant failing to control the speed of his truck by rear-ending the plaintiff. Plaintiff will even be able to show that the Defendant believes based upon its own investigation that its own driver was negligent and responsible for this accident.

Defendant also indicates in its trial brief that the Court should consider various sections of the California DMV Driver Handbook. However, the California Driver Handbook is not a statute or regulation, it is an evidentiary matter that should have been taken up by Defendant's accident reconstruction expert Mr. Molnar in his opinions about any standard of care that Plaintiff failed to meet in driving her vehicle for a vehicle operator in California. But, a careful review of Mr. Molnar's deposition taken on October 19, 2021, a review of his two reports, one a direct opinion report dated July 30, 2021 and the other a rebuttal report to the opinions of Colonel Smith dated September 10, 2021 do not mention the California DMV Driver Handbook in any way, and nor does he have any opinion that Plaintiff violated any kind of standard of care, including the California DMV Driver Handbook, nor any other standard of care. His opinion in sum and substance is that the physical evidence is more consistent with the Defendant driver's version of the accident than the plaintiff's version of the accident, which of course is not only disputed but will be discredited at trial. The July 30, 2021 report of Mr. Molnar is annexed as Exhibit "1", his September 10, 2021 report is annexed as Exhibit "2" and his deposition taken on October 19, 2021 is annexed as Exhibit "3".

Plaintiff intends to object at trial to any offering related to the standard of care of the plaintiff's operation of her vehicle including any violation of the California DMV Driver's Handbook because the California DMV Driver's Handbook was not disclosed in fact or expert discovery as a source that would be offered or relied on at trial, and none of Defendant's experts, including Mr. Molnar their accident

reconstruction expert, mentioned it or even offered an opinion on the standard of care including a violation of the California DMV Driver's Handbook.  In order to admit any opinion based on the California DMV Driver Handbook, an expert would need to be qualified and would need to lay a foundation and offer the opinion based on the standard of care, and this was not done by Defendant's experts at deposition and they all testified that all of their opinions were contained in their reports and their deposition, including Mr. Molnar.  Defendant goes on to discuss in their brief further the blind spots on the truck and how that issue is contained in the California DMV Driver's Handbook, but Mr. Donckel's never discussed the blind spot in his deposition, he never discussed the California DMV Driver's Handbook or any section of it in his deposition, and again, Defendant's accident reconstruction expert, Mr. Molnar, did not mention any issue in his deposition or his two reports related to any blind spot for Mr. Donckels or to any reference to the California DMV Driver's Handbook.  Plaintiff will be objecting to any of this purported testimony or the use of the California DMV Driver's Handbook on these bases at the time of trial.

### III.   PLAINTIFF DID NOT MISCHARACTERIZE THE TESTIMONY OF MR. MOLNAR ON THE PEAK ACCELERATION IN THE ACCIDENT

Defendant's discussion regarding the testimony of their expert Mr. Molnar in their trial brief is fundamentally flawed. First, Mr. Molnar discusses in his July 30, 2021 report at page 23 that large accelerations and velocity changes are an important factor in considering impact severity in these kinds of collisions, annexed hereto as Exhibit "1". Mr. Molnar continues to debate in rebuttal form the severity of the acceleration during the accident in his September 10, 2021 report, pages 3-5, annexed hereto as Exhibit "2". But in his deposition, he opined as follows, starting at page 36, line 17 through page 40 line 11:

1  "Q   Did you calculate any of the forces in the accident?

2      A   I used the accelerations from relevant crash testing to  determine the
3  delta-v, and based on Newton's Second Law of  Motion — as is proportional to
4  acceleration.  Now, did I  calculate the actual raw number for the force?  No.
   But I did  rely on the accelerations which are proportional to the forces.      Q
5   What was the peak acceleration that was received in the accident by Ms.
6  Flaherty?

7      A   It's difficult to determine due to the lack of data that we have for
   physical evidence, but based on similar  empirical data and in crash testing
8  literature that has been  performed with similar damage to vehicles, the peak
   acceleration  tend to be, approximately, 1.2 gs from all of the literature  that I
9  have reviewed.

10     Q   What is 1.2 gs analogous to in everyday life?

11     A   Well, it's very difficult to say because it depends on  over what time
   period it occurs.

12     Q   I'm sorry.  If you don't mind me interrupting, if you  don't mind.
13      Did you get a delta-t, change in time?

14     A   I did not for this collision, but I did analyze the  change in time over
   the collisions in the crash testing that was  very similar.

15     Q   What was it?

16     A   Generally speaking, it was between — it's very  complicated because it
   depends on what part of the collision  you're talking to.  The entirety of the
17  collision in a lot of  the research was between, I believe, one and a half and two
    seconds for the entirety of the collision.  There are little  pulses of acceleration
18  within those — within that one and a  half to two seconds.

19     Q   So now, let me get back to the question that I  interrupted on.
20      What is comparable in everyday life that has the acceleration of 1.2 gs
   that occurs between one and a half and  two seconds?

21     A   Well, I think the best example would be hard braking in  a vehicle.
22  Hard braking can generally get up to about 1g as far  as average acceleration,
   but the peak accelerations that you  experience during an average 1g braking
23  maneuver can get beyond  1.2, potentially.  So I would say slightly more than a
   hard  braking maneuver.

24     Q   When you say "slightly more than a hard braking  maneuver," can you
25  give me an example of what speeds we're  talking about that the hard braking
   would be involved with?  In  other words, what speed are we at for the hard
26  braking to be  analogous to the acceleration and delta-t here?

27     A   There is no speed.  You can have acceleration of 1g at  40 miles an
   hour or 20 miles an hour or 60 miles an hour.  Now,  if you're saying to get 1.2
28  gs from, let's say, the — speeds  were stopped, I can potentially give that to
   you.

Q   Yes, please.

A   I would have to perform that calculation. If we need to go through that I need to get my calculator and do that.

Q   Can you give me an estimate?

A   No. I would want to calculate that. I don't want to testify to something incorrectly.

Q   How long would that take?

A   The calculation? I could do it in a few minutes.

Q   Okay.  Go ahead.

VIDEOGRAPHER:  Are we staying on the record?

MR. MCELFISH:  Yes.

I am almost done.  I want to stay on the record and finish  up.

THE WITNESS:  Are we still on the record?

BY MR. MCELFISH:

Q   Yes, sir.

MS. YANG:  Yes.

THE WITNESS:  Would you like the answer to that question?  BY MR. MCELFISH:

Q   If you don't mind.  Thank you.

**A   Yeah.  So the calculated speed over one and a half  seconds with an average acceleration of 1.2 gs would be 40 miles  per hour to 0.  Now, to be clear, once again that is the peak  acceleration that we are seeing in these crashes rather than an  average acceleration.**

**Q   Right.  But you don't have an opinion as to what part  of the acceleration, whether it's peak acceleration or something  else this is injury-causing?**

**A   Correct.  Correct.**

**Q   So what is it two. — at 2?**

**A   I mean, I would estimate it.  It's probably in the --  so it would be probably 40 to 50 miles per hour for two seconds,  somewhere in there.**

**Q   All right.  Thank you.  So if I got this straight,  correct me if I'm wrong, Ms. Flaherty experienced, at some point  during this accident during the delta-t, a peak acceleration  between one and a half to two — I'm sorry.  1.2 between one and  a half to two seconds which is equivalent to a hard braking  maneuver between 40 miles an hour and 0?**

**A   Yeah.  A similar calibration.  Yes.**

Q   Okay.  All right.  Do you have any other direct  opinions that you're going to offer at trial?  We'll get to  rebuttal now.

A   No.

*See* Deposition of Mr. Molnar, annexed hereto as Exhibit "3", pages 36-40.

The portion of the transcript that has been quoted and inserted into this brief for the Court to see is his own expert opinion based on his report, his analysis, his training and experience and his calculation for the forces in this accident set forth in his deposition. The nuances that the defense is attempted to wrap around their argument relates to the Delta T—the change in time that the it took for the crash to occur—that Mr. Molnar calculated for this accident, which was 1.5-2.0 seconds. So, his opinion generally is measured by peak acceleration, that the peak acceleration in this accident was 1.2Gs, which occurred over 1.5-2.0 seconds, which in real life is the equivalent of traveling 40-50 mph and executing a hard braking maneuver from 40-50 to 0 in 15.-2.0 seconds. That is his testimony and he can try to explain it or characterize it in any way he wishes at trial and the Court can consider his opinions. He is qualified, the issues are inside the scope of his expertise and he offered those opinions and calculations on the record under oath. He is not offering an opinion on injury causation or biomechanics, he is offering an opinion on the calculation of the peak acceleration, which is the centerpiece of accident reconstruction typically needed and relied on by biomechanical experts as a foundation for their opinions on injury threshold.

## IV.   PLAINTIFF IS NOT LIMITED BY THE ADMINISTRATIVE CLAIM

Defendant cites to 28 U.S.C. § 2675(b) as follows: This section states that an "[a]ction under this section shall not be instituted for any sum in excess of the amount of the claim presented to the federal agency, except where the increased amount is based on newly discovered evidence not reasonably discoverable at the time of presenting the claim to the federal agency, or upon allegation and proof of intervening facts, relating to the amount of the claim." First, Plaintiff explanation in the Plaintiff's Findings of Fact and Conclusions of Law, filed on December 17, 2021 (Dkt# 61), page 5 of 11, is that Plaintiff will not be limited by the amount of

$850,000 for damages based on 28 US Code 2675(b) due to the "increased amount based upon newly discovered events not reasonably discoverable at the time of the present claim".   And, this issue was never raised by Defendants in any motion in limine and was not at all discussed with the Court in the lengthy Pre-Trial Conference held last week on September 9, 2022---never mentioned once and not at all before that.

The facts surrounding this issue are that the Administrative Claim was filed with the Accident Investigation Sierra Coastal District on April 15, 2019.  But in April of 2019, Plaintiff was undergoing extensive physical therapy and chiropractic treatment with Dr. Stephen Magdick, D.C. in an attempt to resolve the injury and the pain which continued until April 30, 2019. Plaintiff did not seek clearance for surgery until May 23, 2019 when she went to see Dr. Alexander because her conservative treatment had failed and June 27, 2019 when she was admitted to Cedars for dizziness when she went for her surgery clearance.  Plaintiff did not actually undergo surgery until July 5, 2019. Even though Dr. Alexander discussed surgery with Plaintiff *as an option down the road* in February 27, 2019, he also discussed other more conservative measures such as therapy, cervical epidural steroid injections, which she ultimately declined. Plaintiff testified in her deposition that she did not want surgery and did not want to consider it until she had to do it.

Defendant cites to the case of *Wilcox v. US. Postal Service,* 2019 WL 4138007 (may 3, 2019), which is not a reported case in the Federal Supplement. In that case, Judge Stanton found that the later diagnosis of a torn area of the spine was "cumulative and confirmatory" of the earlier symptoms that the plaintiff experienced. Here, the situation is much different than in *Wilcox.* In the present case, plaintiff was aware she had a herniated disk in her neck, but was undergoing conservative care to resolve it at the time that this administrative claim was filed. She had seen Dr. Alexander who had given her different options on how to treat the injury with surgery only being one of them in the future. But in April of 2019,

Plaintiff had no intention of undergoing a neck fusion, which is a serious life altering event that is never taken lightly, which was the basis for the lower amount in the administrative claim.  In other words, she did not make a claim for an exorbitant amount of damages that she did not believe she was going to incurred based on a surgery that was not going to happen at that time.  Even after Dr. Alexander discussed all of her options in February 27, 2019, plaintiff returned to chiropractic care in an effort to resolve the pain for months and months, and even continued to do so after the administrative claim is filed in April of 2019, three (3) months later. The Court will hear evidence on this issue at trial from Dr. Miller, the defense medical expert, that this was not even a herniated disk injury, that it was a degenerative condition that should have resolved shortly after the accident and that Plaintiff should never have had surgery on her cervical spine under these circumstances because she did not need it.  Dr. Miller believes that conservative care should have resolved the symptoms for Plaintiff and honestly, Ms. Flaherty believed the same thing at the time the claim was filed. Plaintiff believed that therapy would resolve her issues and that none of the other options would be needed including other conservative measures such steroid epidural injections. The Court should hear the evidence on this issue at trial since it was never raised by the defense in pre-trial motions, and allow the parties to brief the issue further in post-trial briefings. But in short, the law does not hold a plaintiff responsible for claiming every single possible injury and every single possible procedure that could be done at various points in the treatment to be included in an administrative claim early in treatment before a lawsuit is filed, that would be entirely unfair and defeat the intent of the statute.

The controlling case for this Court to consider is the cited and reported 9th Circuit case of *Richardson v. United States,* 841F.2d 993, 999 (9th Cir. 1988), which the Defendant in this case barely mentioned in their discussion.  In *Richardson,* the Court of Appeal did find that the trial judge used the wrong standard by limiting the damages because occurred prior to trial and not after the administrative claim was

filed. But the significant holding in *Richardson,* in citing to the 1984 District Court of Connecticut in *Powers v. United States,* 589 F. Supp. 1084-1109-10 (D. Conn. 1984), is that the question for the District Court is that whether the condition worsened or there were other developments after the claim was filed and whether the damages sought were foreseeable when the claim was filed. *Richardson* at 999. In *Richardson,* the question was whether the amputation and psychological injuries were reasonably foreseeable and the Court of Appeal left that question to the trial judge on re-trial. *Id.* But in so holding, *Richardson* set the standard of whether "the *full extent of Richardson's injuries was reasonably foreseeable"* and "worsening pain and unanticipated need for extensive nursing care constituted intervening facts". *Id.* And, in relying on *McDonald v. United States,* 555 F. Supp. 935, 957-61 (M.D.Pa. 1983), whether there is evidence that the conditions became worse or there was development in the care. That is exactly the case we have here, after the administrative claim was filed, the condition worsened and Plaintiff underwent a surgery that she never intended to have.

The *Wilcox* case is not binding on this Court and the facts in that case are not in any way logically analogous to the facts here, and the reasoning in *Wilcox* seemed to follow the strictest interpretation of the statute and did not consider all of the factors that the *Richardson, Powell* and *McDonald* Court's considered and set forth as the standard. Here there will be evidence at trial that Plaintiff was given many different options for her care from Dr. Alexander in February of 2019, but she continued to seek conservative care until that failed, the pain got worse, the arm pain and numbness developed to the point where she had to have surgery in the summer of 2019, which is what triggered the significant amount of her medical care, a significant amount of her medical bills, her need for future care and the significant costs that are going to be associated with that and as well as increased anxiety and psychological injuries and damages. It is the increased pain and the need for surgery that may have been one of many options at the time that the claim was filed, but it

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**

was not needed, it was not decided on, it was not acted on, in fact the evidence at trial will be from plaintiff that she did not want surgery and did everything she could to avoid it, and from Dr. Miller who believes that she had a soft tissue injury well into 2019. In *Wilcox,* the Court ruled that the *diagnosis* was confirmatory of the pain, here it was the need for surgery that arose when the conservative care ultimately failed in the summer of 2019 after the claim was filed. As is demonstrably significant, Plaintiff's medical bills went from a minor amount to hundreds of thousands of dollars after the administrative claim was filed and now she will need significant future care including future surgery that Dr. Mobin will discuss that was not reasonable foreseeable at the time either.

## V.    PLAINTIFF IS NOT BARRED BY THE DISCRETIONARY FUNCTION EXCEPTION

Defendants state that Plaintiff is barred by the FTCA's discretionary function exception codified at 28 U.S.C. § 2680(a). However, 28 U.S.C. § 2680(a) reads:

Any claim based upon an act or omission of an employee of the Government, **exercising due care**, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused. *(emphasis added).*

Here, the issue presented is that Defendant was not exercising due care, therefore Plaintiff may not be barred by the FTCA's discretionary function exception. Defendants indicate that they have not waived their sovereign immunity to claims barred under this exception. This would be true if the Defendant was exercising due care. Furthermore, Defendants are alleging that Plaintiff's negligent entrustment cause of action has no evidentiary basis. However, it is within the Courts discretion to determine whether or not the evidence presented during trial have basis and

-12-

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**

whether Defendant was exercising due care. Here, if the Court concludes that Defendant did not exercise due care, then Plaintiff is not barred from contending a negligent entrustment cause of action.

Defendants cite *Chadd v. United States,* 794 F.3d 1104 (9th Cir. 2015), which involved a Plaintiff who brought an action against the National Park Services relating to a mountain goat that attacked and killed a Park visitor. The goats were seeking out areas visited by humans. Therefore, the Park investigated the situation and began warning visitors. However, officials were shooting the goats and provoking them. Plaintiff Boardman and his wife were hiking when he was violently attacked by a goat and later died of his wounds. Chadd on her own behalf, filed a suit against the United States and the National Park Service under the FTCA, alleging that Park officials breached their duty of reasonable care by failing to destroy the goat in the years leading up to Boardman's death. The Court applied the two-step inquiry and found that the Park officials need only point to "some support in the record that the decisions taken were susceptible to policy analysis for the discretionary function to apply," and that standard is more than met here. *Chadd v. United States,* 794 F.3d 1104, 114 (9th Cir. 2015). This case is not analogous, because Defendants never took action to analyze Mr. Donckels' conduct and whether he was exercising due care. In *Chadd,* the Park officials took action by investigating the situation and implementing safeguards by warning visitors. Here, Defendants did not do that, in fact, there is no record indicating any act by the Defendants to prevent this accident.

Defendants also refer to *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984)), where the Court found that it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary functions exception applies in the given case. This case is also not analogous, because here, the nature of Mr. Donckels' conduct fell below the standard of care when he did not exercise the reasonable care by driving safely.

Defendants cite *O'Toole v. United States*, 295 F.3d 1029, 1033 (9th Cir. 2002), which is case involving a cause of action for property damage. However, in *O'Toole,* the Court explained that the plaintiff has the burden of showing there are genuine issues of material fact as to whether the exception should apply, while the government bears the ultimate burden of establishing that the exception applies. *Id* at 1032. Here, Plaintiff has not introduced her case to show that there is a material fact as to whether the exception should apply. All of the factual allegations in the plaintiff's complaint are to be taken as true in reviewing a discretionary function exception dismissal under the FTCA. *Id.* The Court found that the BIA's decision to allow the irrigation system on Bowler Ranch to fall into disrepair to the detriment of neighboring landowners does not fall within the protection of the discretionary function exception to the FTCA, and reversed the district court's dismissal for lack of jurisdiction. *Id* at 1037. Here, similar to *O'Toole,* Defendants' lack of supervision and control was a detriment to the general public, and thus does not fall within the exception.

Defendants cite *Nurse v. United States*, 226 F.3d 996, 1001 (9th Cir. 2000), where a Plaintiff brough suit for emotional distress after she was unlawfully stopped, arrested and searched during a trip from Canada to the United States. In this case, however, the complaint alleges that the policy-making defendants promulgated discriminatory, unconstitutional policies which they had no discretion to create. In general, governmental conduct cannot be discretionary if it violates a legal mandate. (See *United States Fidelity Guaranty Co. v. United States*, 837 F.2d 116, 120 (3d Cir.) cert. denied, 487 U.S. 1235, 1087 S.Ct. 2902, 101 L.Ed.2d 935 (1988).) *Nurse v. United States*, 226 F.3d 996, 1001, 1002 (9th Cir. 2000) Because of the bare allegations of the complaint, we cannot determine at this stage of the proceedings whether the acts of the policy-making defendants violated the Constitution, and, if so, what specific constitutional mandates they violated. These are questions that will be fleshed out by the facts as this case proceeds toward trial. *Id.* Similar to *Nurse,*

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**

the Court will determine the outcome by the facts presented during the trial. However, Plaintiff will show that Defendants were negligent in supervising Mr. Donckels when he failed to exercise due care by negligently operating a seven-ton truck. Furthermore, Plaintiff will offer testimony that will indicate how the supervisor at USPS, Mr. Jones assumed that Mr. Donckel's went to retraining after the subject incident. Mr. Jones testified in deposition that there are measures taken, such as reprimanding drivers if they fail to comply, observations and evaluations that are done to check the performance of the drivers, and retraining. However, there are no records indicating that Defendants actually reprimanded, retrained or even observed and evaluated Mr. Donckels. Thus, Plaintiff should have the opportunity to introduce evidence during trial for the Court to determine whether or not the exceptions apply.

## VI.    <u>CONCLUSION</u>

For the reasons stated above, the Court should consider the evidence on these issues and make a ruling based on the totality of the record post-trial.

Dated**:** September 19, 2022                **MCELFISH LAW FIRM**

By: _____
Raymond. D. McElfish, Esq.
Attorney for Plaintiff Charlotte Flaherty

**PLAINTIFF'S TRIAL BRIEF UNDER LOCAL RULE 16-10**